726 So.2d 670 (1998)
Robert M. ALVERSON
v.
TRANS-CYCLE INDUSTRIES, INC.
Trans-Cycle Industries, Inc.
v.
Robert M. Alverson.
2961289.
Court of Civil Appeals of Alabama.
June 5, 1998.
Rehearing Denied July 31, 1998.
Certiorari Denied December 18, 1998.
Erskine R. Funderburg of Trussell & Funderburg, P.C., Pell City, for appellant/cross appellee Robert M. Alverson.
Stephen A. Rowe and David W. Spurlock of Lange, Simpson, Robinson & Somerville, Birmingham, for appellee/cross appellant Trans-Cycle Industries, Inc.
Alabama Supreme Court 1971983.
BEATTY, Retired Justice.
The plaintiff, Robert M. Alverson, appeals from the damages award aspect of a judgment *671 in his favor against the defendant, Trans-Cycle Industries, Inc. ("TCI"). TCI cross-appeals from the judgment in favor of Alverson on his own claims and on its counterclaim. Our supreme court transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975. We reverse and remand as to the appeal, and we affirm as to the cross appeal.
TCI is a company that disposes of polychlorinated biphenyls (PCBs) and other hazardous waste. The disposal of PCBs, the manufacture and distribution of which have been prohibited in the United States since 1982, is extensively and rigorously regulated by the Environmental Protection Agency. TCI began business in New York in 1985; in 1990, it opened a second plant in Pell City. The Pell City plant disposes of electrical transformers and other equipment containing significant amounts of PCB-contaminated electrical fluids and other PCB waste. According to TCI's president and principal shareholder, David Laskin, TCI has an excellent reputation in the industry. He testified that TCI never has been issued any citation for regulatory violations and that it never has caused or experienced any accidental spill or release of PCB-contaminated materials.
From 1990 to 1996, the Pell City plant grew from 2 employees to 110. Laskin is a resident of New York. In early 1996, Laskin, who then was spending three to four days in Alabama every two weeks to oversee the management of the Pell City plant, decided to hire a general plant manager for that facility. Laskin hired Sandra Wells, a consultant for TCI who had conducted "team building and communication" workshops with the employees of the Pell City plant, to coordinate the search for a general manager. In late February 1996, Wells placed on the internet an advertisement for the general manager's position in Pell City. That advertisement stated, in pertinent part:
"Description: SeekingHighly creative, enthusiastic individual to facilitate a dedicated self-motivated team approach to customer service. Individual must demonstrate a commitment to integrity; personal and professional growth; self-awareness and partnership in service. Currently, TCI, Inc., is staffed by a management team of five, a clerical support team, a production team and a sales team. These teams are looking for an individual to oversee the entire operation. Primary areas of focus would include; profitability, effective efficiency, long range planning and direction, maximization of resources.
"Qualifications: Useful ExperienceIndustrial engineering; financial management; team building; efficiency troubleshooting; TQM training; production management; people skills. Knowledge of the industry would be useful, although it is not a prerequisite for this position."
Alverson saw the advertisement and responded. Alverson resides in California, but he is a native of Alabama. Alverson testified that one reason he responded to TCI's advertisement was that he was interested in returning to Alabama. During the next several days, Alverson, Wells, and Laskin exchanged electronic mail (E-mail), facsimiles (faxes), and telephone calls. They also exchanged documents, Alverson providing his résumé and Laskin providing information about TCI. The record contains copies of many of those documents, as well as copies of notes Alverson took during telephone conversations with Laskin and Wells.
In his résumé, Alverson summarized his qualifications as follows:
"Take-charge general management, operations, product-marketing and financial manager who delivers bottom line results.
"Proven transferable experience in corporate, entrepreneurial and consulting roles. Strength in positioning high technology, manufacturing and service companies for long-term growth and profitability. In-depth experience and achievement in operations, manufacturing, finance, product-marketing development, worldwide marketing, planning, acquisitions, and information systems. Full P & L responsibility. Record of producing constructive company re-engineering. Strong leader and team player. Extensive global business experience (Pacific Rim and Europe)."
In the section listing his business experience and accomplishments, the résumé stated that *672 since 1990 he had been employed by Global Eagle, Ltd., which the résumé described as a "private holding company with majority ownership in various stock firms." Beneath the item naming and describing that company, the résumé stated that Alverson was the "General Manager, VP Sales/Marketing and CFO" of AP Systems, Inc., which the résumé described as a "business and technology development corporation," and of Uniglobe Atlas Travel, Inc., which it described as a "business travel services franchise." Alverson testified that he was the sole owner of all three businesses and that he ran them from an office in his home in Los Angeles. After listing what was then his current employment, Alverson's résumé stated that he had worked in the telecommunications business for Teledex Corporation; Ala, Inc.; and Rolm Corporation, for a total of approximately 8 years; and in the equipment business for International Harvester Company and Sperry Rand for approximately 13 years. The résumé indicated that Alverson's educational background included an M.B.A. from the University of Chicago, an M.S. in engineering from Purdue University, and a B.S. in engineering from Auburn University.
Laskin and Wells selected three applicants, including Alverson, to come to Pell City for interviews. On March 19, each of the applicants toured TCI's plant and met with Laskin, Wells, and the department heads who made up the plant's management team. Alverson stated that his initial personal interview lasted about three hours. Laskin and Wells requested that Alverson spend the night in Pell City. He agreed to do so and to meet that evening with Cynthia Orms, TCI's general counsel, and George Jackson, its vice president of sales. The next day, Alverson was interviewed further by TCI's management team and department heads. He then traveled to Birmingham to meet members of his family. Gary Waldren, TCI's vice president and plant manager, contacted Alverson at his hotel in Birmingham, faxing additional questions to him and conveying Laskin's request that Alverson telephone New York attorney Michael Zarin, a friend of Laskin's who did legal work for TCI. Alverson says that he immediately faxed to Waldren handwritten answers to his questions and conferred with Zarin by telephone. The following day, Alverson, Waldren, and the other TCI department heads held a conference call. Alverson then returned to California. Alverson testified that after speaking with Waldren by telephone and communicating with Wells by E-mail, he understood from them that he would be offered the general manager's position.
On April 1, Laskin telephoned Alverson to tell him that he had been chosen to be the general manager of the Pell City plant. On April 4, Laskin faxed a job description to Alverson and they began negotiations about the details of Alverson's proposed employment. Also on April 4, Wells faxed information to Alverson about a "training" seminar sponsored by the Hendricks Institute that she and Laskin wanted him to attend in New York beginning on April 28. Alverson's wife also was invited to attend the seminar. The Hendricks Institute espoused a self-awareness philosophy embraced by Laskin and his wife, who had participated in its seminars. Wells was associated with the Hendricks Institute as a "facilitator." Wells had conducted Hendricks Institute training sessions for TCI employees at the Pell City plant, and Laskin testified that he had integrated Hendricks principles into his management style and that he believed in the Hendricks philosophy and methods. Alverson testified that he knew when he accepted the general manager's position that the Hendricks Institute philosophy and training were important to Laskin. He stated that he was enthusiastic about attending the seminar and that he conveyed that to Laskin and Wells.
On April 8, after a conference call with Laskin and Wells, Alverson transmitted a proposed compensation package to Laskin. After additional negotiations during which Laskin and Alverson agreed on most of the details, Laskin asked Zarin to prepare an employment contract. Alverson and Zarin negotiated for three days about the details of the contract. The record contains several versions of the contract faxed between Zarin and Alverson, with notations of proposed changes and corrections. A particular subject of their negotiations was a "buy-out" clause that Alverson had requested, the purpose *673 of which was to compensate him in the event he was discharged from TCI without cause during the first three years. Alverson testified that he wanted the protection of a buy-out clause because he and his wife would be making significant changes in their lives when they moved from California to Alabama. Alverson initially proposed a buy-out clause in excess of $250,000. After extensive negotiations between Zarin, Laskin, and Alverson, Alverson agreed to accept Laskin's offer of a buy-out provision paying $150,000 during the first year, $125,000 during the second year, and $75,000 during the third year. Zarin then prepared a final draft of the employment contract, which Alverson and Laskin executed on April 15, 1996.
The contract was for a three-year term beginning on April 28, 1996, but it provided that TCI could terminate the agreement subject to certain conditions. The termination provisions, which included the final version of the buy-out clause, stated:
"3. Term. The term of this Agreement shall commence on April 28, 1996, and shall continue for a period of three (3) years, provided, the Employer may terminate the Agreement at any time in its sole discretion subject to the conditions herein.
"Notwithstanding the above, the Employer may terminate this Agreement for `cause' upon the occurrence by Employee of any of the following events:
"....
"(ii) dishonesty, fraud, theft, fraudulent misconduct or disclosure of trade secrets;
"....
"(vi) the Employee is in breach of this Agreement; or
"(vii) any conduct on the part of the Employee intended to or likely to injure the business of the Employer.
"In the event of termination for `cause' under this Section 3, Employee shall be entitled to his compensation to the date of termination, plus such other amounts, if any, to which he may be entitled under any other provisions of this Agreement or law; provided, the Employee shall not be entitled to any payments set forth under the immediate subsequent paragraph and paragraph five (5) hereunder.
"In the event the Employee is terminated for other than for `cause' hereunder, the Employer shall pay the Employee an aggregate amount equal to, if the Employee is terminated (i) during the period from the commencement of this Agreement to his first anniversary date, $150,000.00, (ii) during the thirteenth (13) month through the twenty-fourth (24) month of his employment hereunder, $125,000.00, and (iii) during the twenty-fifth (25) month of employment to the end of this Agreement, $75,000.00."
The contract provided for Alverson to receive a base salary of $77,000 per year, medical insurance, a profit-sharing plan, continuing education, three weeks' vacation per year, and sick leave. TCI also agreed to pay Alverson's relocation expenses, to supply him with an automobile, to pay $3,000 per year toward the cost of his life insurance, and to pay him a performance bonus of 2.5% of TCI's annual net profit in excess of its 1996 net income.
During the period between Alverson's return to California from his initial interview in late March and his commencement of employment by attending the Hendricks seminar in late April, he made arrangements to sell a house he and his wife owned in San Diego. He testified that, based on his understanding from Wells and Waldren that he would be offered the job in Alabama, he signed a contract on March 26 to list the house for sale at a price of $245,000, a reduction of $30,000 from the previous asking price. Shortly thereafter, the house sold for the reduced price. Alverson testified that, pursuant to California's tax laws, the San Diego house was his primary residence. He also testified that he and his wife planned to lease their house in Los Angeles for a time because they could not sell that residence immediately without incurring a large tax liability. Alverson testified that, in addition to disposing of his California real estate, he underwent a physical examination required by TCI, obtained a life insurance policy, and began winding down his business affairs with the companies he operated.
*674 After executing the employment contract, Alverson and his wife began making plans to attend the Hendricks Institute seminar scheduled to begin on April 28, when he was officially to begin work for TCI. Wells conducted a "facilitator interview" with Alverson by telephone and also provided certain written questions, which he answered. In the conversation and in his answers, he described for Wells his background in fields of study and seminars that he said he thought were similar to the training offered by the Hendricks Institute. Alverson testified that he also bought two books Wells had recommended so that he and his wife could obtain some background information and begin to understand the Hendricks Institute philosophy. After reading the books, Alverson said, he began to wonder whether the Hendricks Institute was a "charlatan-type operation" and he expressed some of his concerns to Wells. Nevertheless, he and his wife attended the seminar. Alverson testified that although he did not agree with some of the principles and methods employed during the seminar, he participated to the best of his ability. Both he and his wife received certificates indicating their satisfactory completion of the seminar.
Alverson and his wife had dinner with Laskin and his wife on Friday evening after the conclusion of the seminar. During the evening, Alverson testified that his wife mentioned that upon her return to California, she would make plans to give her termination notice to her employer and to complete the leasing of the Los Angeles house. Alverson says she also discussed with Laskin potential employment in Pell City. After his wife returned to California, Alverson spent Sunday afternoon and evening with the Laskins at their home. On Monday morning, May 6, Alverson went to Laskin's office to meet with him. He testified as follows:
"Q. What happened at that meeting?
"A. I walked into his office, he immediately went to behind his desk and put his hand over his stomach. He said he had a knot in his stomach, I didn't fit like a glove, and he wanted to rescind the employment agreement.
"Q. Did he tell you why?
"A. No, sir.
"Q. Did he give you any reason at all?
"A. No, sir.
"Q. What did you tell him?
"A. I told him that I was shocked and that I understood from our prior extensive development of that agreement that he had full right to terminate at any time under the buy-out clause and that I wasn't emotionally able to make any further comment on it.
"Q. Had you and Mr. Laskin experienced any conflicts or even disagreements concerning anything over the past week, week-and-a-half?
"A. No, sir."
On May 8, TCI's general counsel in Pell City wrote a termination letter to Alverson that stated, in pertinent part:
"This will confirm your conversation with David Laskin of May 6, 1996, whereby Trans-Cycle Industries, Inc. (`TCI') rescinds immediately the Employment Agreement between TCI and yourself dated April 15, 1996 (the `Agreement'), as well as terminates any employment you might have had with TCI as of even date.
"These actions are being taken due to TCI's discovery and belief that you were not completely truthful and honest during the negotiations of your employment with TCI. TCI believes that certain comments and conditions made by you during those negotiations were inaccurate and misleading. TCI materially relied on many of these statements in consummating the Agreement. Thus, TCI is rescinding the Agreement pursuant to both its common law contract rights, as well as section 3(ii) of the Agreement."
Alverson testified that he learned for the first time in that letter that Laskin was accusing him of being dishonest. Alverson demanded the $150,000 specified in the buy out provision of the contract, but TCI refused to pay it, maintaining that it had discharged him for cause.
On July 18, 1996, Alverson sued TCI, alleging a breach of the employment contract and demanding damages pursuant to the buy-out clause, or, in the alternative, standard *675 damages for breach of contract. TCI answered and counterclaimed against Alverson, claiming that the buy-out clause in the contract was an unenforceable penalty provision and alleging that Alverson had procured the contract by fraud. TCI demanded that Alverson be required to reimburse TCI for its expenses in recruiting him. Alverson later amended his complaint to add claims of fraud and suppression. After a nonjury trial, the court entered the following judgment:
"This cause came on to be heard on the pleadings of the parties, testimony and exhibits received in open court. Subsequent to the trial briefs were submitted by the parties. After considering all of the foregoing, the court finds the issues in favor of the plaintiff and against the defendant and assesses the plaintiff's damages at Eighty seven thousand five hundred and 00/100 Dollars ($87,500.00)."
In his appeal, Alverson contends that the damages awarded by the trial court were inadequate. Because the trial court decided all issues in his favor, he argues, the court erred in awarding him less than the amount specified in the parties' employment contract for liquidated damages. Before we address the award of damages, however, we first must review TCI's argument in its cross appeal that the trial court erred in entering the judgment in Alverson's favor.
TCI contends that the trial court's judgment was plainly wrong as a matter of law, and that the court erroneously applied the law to the facts of this case. TCI insists that it discharged Alverson for cause and argues that the trial court erred in not finding in its favor, both as to Alverson's claims and as to its counterclaim.
We review this case according to the following standard:
"When the trial court in a nonjury case enters a judgment without making specific findings of fact, the appellate court `will assume that the trial judge made those findings necessary to support the judgment.' Transamerica Commercial Fin. Corp. v. AmSouth Bank, 608 So.2d 375, 378 (Ala.1992). Moreover, `under the ore tenus rule, the trial court's judgment and all implicit findings necessary to support it carry a presumption of correctness.' Transamerica, 608 So.2d at 378. However, the judgment of a trial court carries no presumption of correctness when the judge improperly applies the law to the facts. Marvin's, Inc. v. Robertson, 608 So.2d 391 (Ala.1992)."
Coaker v. Washington County Bd. of Educ., 646 So.2d 38, 40 (Ala.Civ.App.1993). We will affirm the trial court's judgment in a case such as this if, under any reasonable view of the testimony, there is credible evidence to support the judgment. Ex parte City of Jacksonville, 693 So.2d 465 (Ala.1996). Reviewing the voluminous record in this case, including the testimony of the witnesses and the documentary evidence, we find ample credible evidence to support the judgment.
TCI insists that it discharged Alverson for cause, maintaining that Alverson was not truthful about his employment experience, about his and his wife's plans to relocate to Alabama, or about his experience with groups like the Hendricks Institute. In addition, TCI maintains, Alverson did not satisfactorily participate in the Hendricks Institute seminar. TCI also alleges that Alverson sexually harassed a female Hendricks facilitator during the seminar; Laskin says the harassment incident caused him to become concerned about Alverson's character. Laskin testified at trial that he decided to discharge Alverson because he had been "totally dishonest in many, many factors" and that he told Alverson at their meeting in New York on May 6 that his discharge was "based on dishonesty." Laskin also testified that Alverson's "completely rebelling and not participating in the [Hendricks] training" and the alleged sexual harassment incident played a "very important" part in his decision.
Laskin, Wells, and George Jackson testified about Alverson's alleged dishonesty during the interview process. Laskin and Jackson said that Alverson did not explain to anyone at TCI that he was working for himself and running his companies from an office in his home. Both stated that they felt Alverson had misled them about his qualifications. Laskin also testified that Alverson represented to him that he and his wife were *676 selling their Los Angeles home to move to Alabama and that Mrs. Alverson was quitting her job. Laskin said he was surprised to learn that the Alversons planned to lease their home and that Mrs. Alverson had not yet quit her job. Finally, Laskin and Wells testified that after TCI hired Alverson, it became apparent to them that he had not been truthful about his experience with Hendricks Institute philosophy and that he did not embrace its principles.
Alverson readily acknowledged at trial that he did not mention to anyone at TCI that he worked for himself or that his office was in his home, but he also testified that no one at TCI ever asked him any questions about his present employment. We need not determine whether Alverson should have provided details about his businesses without having been asked about them, because it is obvious from a review of Alverson's employment background that he had many years of experience in the management area for which TCI recruited him. In addition, Alverson testified that he told Laskin that he and his wife were selling their San Diego house and were leasing their Los Angeles house so that they could move to Alabama. He also stated that he told Laskin that his wife was going to quit her job to move with him to Alabama, not that she already had quit. Alverson stated that he explained to Laskin and Wells that his wife would be taking vacation time in order to attend the Hendricks Institute seminar with him. We note that the record contains documentation corroborating that testimony. Alverson candidly admitted that he overemphasized his experience with groups and philosophies that he thought were similar to the Hendricks Institute, but he said that it was not until after he read the books in preparation for the seminar that he realized the Hendricks Institute was unlike anything in which he had been involved previously.
Laskin and Wells testified that Alverson and his wife were negative during the Hendricks Institute seminar and did not cooperate fully with the training process. A review of their testimony reveals that Alverson's failure to wholeheartedly embrace the tenets of the Hendricks Institute was a primary factor in Laskin's decision to discharge him from TCI. Alverson testified that although he found much of the seminar personally objectionable, he realized that it was important to Laskin, so he and his wife participated and cooperated to the best of their ability. He pointed out that they successfully completed the seminar, and he emphatically denied that he or his wife had done anything to undermine the training.
Finally, Laskin and Wells reported that one of the facilitators at the seminar, Sandra Dunn, had accused Alverson of sexually harassing her. Dunn testified at trial that while she was assisting Alverson with a breathing exercise, he stated to her: "I really liked how you did the breathing, you gave the instruction the other night." She said that he then put his hand on her thigh. Dunn testified that she confronted Alverson during a group session about what she considered offensive behavior, but that he did not respond. Alverson emphatically denied that he had touched Dunn, stating that that would be inappropriate behavior and, furthermore, that his wife was there with him. He also testified that he did not remember Dunn accusing him of any sexual impropriety at the seminar. We note that although Laskin testified that this allegation was a significant factor in his decision to discharge Alverson, the incident was not mentioned in any of the documents provided to Alverson about his discharge, and it was not stated as a factor in Laskin's decision when TCI answered Alverson's interrogatories during the discovery process.
After reviewing the record as a whole, we find that a reasonable view of the evidence supports the trial court's judgment. The record reflects that throughout the entire interview and negotiation process, TCI's personnel, including Laskin, were enthusiastic about hiring Alverson. It was not until Alverson expressed reservations about the philosophy and practice of the Hendricks Institute that Laskin's attitude toward him changed, and then it changed abruptly. Although some of Alverson's claims about himself may have been somewhat exaggerated, it is not unusual for one being interviewed for a desirable job to present himself in the most *677 positive light possible. The trial court apparently concluded that those claims did not rise to the level of fraud. Alverson's testimony also clearly reflects that he and his wife intended to return permanently to Alabama. He testified that they needed to lease their Los Angeles house for a time, for tax purposes, and that his wife planned to quit her job when she returned from the April seminar, to wind up their affairs in California, and then to join him in Pell City. The trial court observed the demeanor of these witnesses, and it is in the best position to judge their credibility. We cannot say that the trial court erred in concluding that TCI discharged Alverson without cause. The judgment in favor of Alverson on his claims and against TCI on its counterclaim is hereby affirmed.
We now address the issue of damages. Alverson argues that the trial court's award of damages is inadequate. Alverson maintains that the trial court should have awarded him the $150,000 in liquidated damages provided for in the contract, or, in the alternative, that he proved that he was entitled to damages greater than $87,500 as a result of TCI's breach of its contract. TCI argues that the buy-out clause is not applicable, or, in the alternative, that it constitutes an unenforceable penalty. Finally, it argues that Alverson is not entitled to any compensatory damages.
Our supreme court has discussed liquidated damages clauses:
"Is there any overriding public policy that compels a court to invalidate and hold void this provision of a contract bargained for and agreed upon by two sophisticated businessmen, each of whom was represented by some of the best legal talent in the state? As the Court stated in Milton Construction Co. v. State Highway Dep't, [568 So.2d 784 (Ala.1990)], the state constitution protects contractual obligations from impairment by the legislature or the judiciary, and the right of freedom of contract is a cherished one that courts are bound to protect.... [U]nder the facts of this case, we cannot hold that the liquidated damages provision is a penalty, as defined by prior cases, requiring a judicial declaration that this contractual provision is void as against public policy.
"This Court set forth the criteria for assessing the validity of liquidated damages clauses in Camelot Music, Inc. v. Marx Realty & Improvement Co., 514 So.2d 987 [at 990] (Ala.1987):
"`It is true in Alabama that, because penalty provisions are void as against public policy, "Courts ... are disposed to lean against any interpretation of a contract which will make the provision one for liquidated damages and, in all cases of doubtful intention, will pronounce the stipulated sum a penalty." Cook v. Brown, 408 So.2d 143, 144 (Ala. Civ.App.1981); see also, Keeble v. Keeble, 85 Ala. 552, 5 So. 149 (1888). In Alabama, liquidated damages are a sum to be paid in lieu of performance, Forsyth v. Central Foundry Co., 240 Ala. 277, 198 So. 706 (1940), while a penalty is characterized as a security for the performance of the agreement or as a punishment for default. Standard Tilton Milling Co. v. Toole, 223 Ala. 450, 137 So. 13 (1931). The courts generally identify three criteria by which a valid liquidated damages clause may be distinguished from a penalty. First, the injury caused by the breach must be difficult or impossible to accurately estimate; second, the parties must intend to provide for damages rather than for a penalty; and, third, the sum stipulated must be a reasonable pre-breach [estimate] of the probable loss. See, C. Gamble and D. Corley, Alabama Law of Damages, § 5-4 (1982). Determining whether a liquidated damages provision is valid is a question of law to be determined by the trial court based on the facts of each case. Cook v. Brown, 408 So.2d 143 (Ala.Civ.App.1981).'"
Sutton v. Epperson, 631 So.2d 832, 835 (Ala.1993).
We must examine the buy-out clause in the contract between TCI and Alverson in light of the standards set forth by our supreme court in Camelot Music, Inc. v. Marx Realty & Improvement Co., 514 So.2d 987 (Ala.1987). If the liquidated damages clause *678 fails to meet any one of the three criteria, it must fail as a penalty. Milton Construction Co. v. State Highway Dep't, 568 So.2d 784 (Ala.1990). We conclude that the contract's buy-out clause is a valid liquidated damages provision.
First, the injury caused by the breach of the agreement is difficult to estimate accurately. Alverson testified about the anticipated salary, bonus, and benefits he lost after he was discharged just one week after he had accepted the job with TCI, not all of which could have been calculated easily. He also testified, however, that his losses were not confined to the lost salary and estimated benefits. He stated that he sold his San Diego house for less than he had expected and that he was "leaving [his] self-employment and anything to do with outside employment" when he accepted TCI's offer. Second, the record reflects that the parties intended to provide for damages rather than for a penalty. In negotiating the amount of the buy-out clause, the parties apparently considered the changes that Alverson and his wife would be making in order to move to Alabama. After extensive negotiations, during which Laskin was represented at all times by his attorney, Alverson agreed to Laskin's proposal for a buy-out clause in which the damages to be paid by TCI in the event of its breach of the contract were to decrease based upon the length of time that Alverson remained in TCI's employ. Finally, we believe the sum stipulated as liquidated damages was a reasonable pre-breach estimate of Alverson's probable loss. Under these facts, we hold that the buy-out clause was not a penalty, but was a valid agreement on a reasonable sum to be paid as liquidated damages in the event that TCI discharged Alverson without cause. As our supreme court stated in Sutton:
"`As we view this clause, it is but a limitation of the amount recoverable in case of a breach of the contract. It is unlike those contracts or clauses construed by the courts as being invalid because providing a penalty though designated as liquidated damages.... [W]e are not at liberty ... to make a new contract for the parties or to strike ... a clause well understood and evidently within the intention of the parties.'"
631 So.2d at 836 (quoting American Dist. Tel. Co. of Alabama v. Roberts & Son, 219 Ala. 595, 598, 122 So. 837, 839 (1929)).
Because the liquidated damages clause satisfies the three requirements set out in Camelot Music, we conclude that the trial court should have awarded $150,000 in damages to Alverson in accordance with the buy-out clause contained in the contract between the parties. The trial court's award of damages is hereby reversed, and the cause is remanded for the trial court to enter a judgment in favor of Alverson for $150,000.
The foregoing opinion was prepared by Sam A. Beatty, Retired Justice, Supreme Court of Alabama, while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala.Code 1975.
APPEALREVERSED AND REMANDED WITH INSTRUCTIONS.
CROSS-APPEALAFFIRMED.
ROBERTSON, P.J., and YATES, MONROE, and THOMPSON, JJ., concur.
CRAWLEY, J., concurs specially.
CRAWLEY, Judge, concurring specially.
I agree that Alverson is entitled to recover $150,000 because Trans-Cycle terminated his employment during the first year of his employment. I write specially to explain that the discussion of the distinction between a liquidated damages provision and a penalty provision is not necessary.
Alabama law defines "liquidated damages" as an "amount to be paid in lieu of performance, a sum agreed upon by the parties to be an adequate assessment of damages which would result from a possible breach." Cook v. Brown, 408 So.2d 143, 144 (Ala.Civ.App.1981) (emphasis added). See also, Camelot Music, Inc. v. Marx Realty & Improvement Co., 514 So.2d 987 (Ala.1987). The contract provided that the employer could terminate the employee without cause, but that if the employer did so during the first year of employment, then the employer would have to pay the employee $150,000. The employer did terminate the employee *679 without cause; however, the contract gave the employer the right to do so. Because no breach of the contract occurred, I conclude that the discussion of liquidated damages is not necessary. Rather, the trial court was obligated to enforce the terms of the contract. Once the trial court found that the employee was terminated without cause, then the trial court had to enforce the terms of the contract, i.e., the employer had to pay the employee $150,000.
The New Mexico Court of Appeals has held that whether a contract provided for liquidated damages or for a penalty is not an issue in a case where no breach has occurred. Nearburg v. Yates Petroleum Corp., 123 N.M. 526, 943 P.2d 560 (Ct.App.1997). Similarly, in this case, no breach occurred and the discussion regarding the distinction between liquidated damages and a penalty is not necessary.