The defendant Congress Life Insurance Company ("Congress Life") appeals from the trial court's judgment entered on a jury verdict in favor of the plaintiff, Deborah Barstow. Barstow had alleged that Congress Life had breached its contract to provide insurance and in bad faith had denied her insurance benefits. We reverse and remand.
On April 3, 1996, Barstow applied to Congress Life for group medical-insurance coverage. The application required answers to a number of questions about Barstow and her children's medical histories, including:
 "2. Have you or any of your dependents had medical or surgical advice, diagnostic testing or treatment in the past five years for any reason?"
Barstow answered this question in the affirmative and disclosed that she had had a mammogram in 1996. She made no other disclosure. The application also stated: *Page 933 
 "I have answered the above questions to the best of my knowledge and belief. I understand and agree that no coverage shall be in force until the certificate of insurance is issued, which shall not be valid unless the first period cost is paid. . . . I also understand that any misstatements or failure to provide sought for information may be used as the basis for rescission of my insurance, in which event the sole liability of Congress Life will be a refund of premiums less any claims paid."
Congress Life thereafter issued Barstow a policy.
In May 1997, Barstow took her daughter Megan to Dr. David Powell, an orthodontist, for treatment of a congenital jaw condition. Dr. Powell referred her to Dr. Joseph Gunter, an oral surgeon. Dr. Gunter wrote Congress Life requesting preauthorization for jaw surgery.[1] The letter was silent as to the proposed date of the procedure, and it stated that Dr. Gunter was submitting the request so that Congress Life could advise Barstow "regarding insurance benefits."
Congress Life's third-party administrator, Corporate Benefit Services of America ("CBSA"), reviewed the request, to determine whether the surgery was covered. CBSA employee Sharon Kytola noted that the coverage had been in place for only a year and that the jaw condition is a kind of condition normally present for several years before surgical treatment. She referred the file to the underwriting department for it to investigate the history of the condition and determine whether coverage had been properly issued. In furtherance of its investigation, CBSA ordered medical records from Dr. Powell and Dr. Gunter. Dr. Powell's records disclosed that Megan had been receiving treatment for the jaw condition since well before the date of the application. Specifically, Dr. Powell's notations from Megan's May 17, 1993, office visit state that Megan "very possibly [would] need 2nd stage when 12-ish" and a "full workup, 1996-ish." His notes from Megan's June 1, 1993, visit stated that Megan was in "need of the first stage of a treatment to start reduction of her overjet, start opening her bite," and that she would "need a second stage of treatment in four or five years." Those records also indicated *Page 934 
that Megan had sought treatment for the condition on the same day that Barstow had submitted her application for insurance.
CBSA also submitted a written questionnaire to Nathan Chu, Congress Life's agent who had solicited the application and had assisted Barstow in answering the medical questions. The questionnaire asked Chu to respond in writing to, among other things, the question whether he had fully and completely asked all of the medical questions and had correctly recorded Barstow's answers. He responded positively to all of the questions.
Congress Life's records reflect that on May 30, 1997, it began a "rescission review" of Barstow's insurance policy. On June 12, 1997, Congress Life froze all medical claims submitted by Barstow, including conditions for which Mrs. Barstow was treated, pending review of the preauthorization request. During the freeze, Barstow personally paid some otherwise covered medical expenses, and during the freeze Congress Life continued to accept premiums from her.
From May through September 1997, Barstow received from Congress Life at least six letters stating that Megan's claim was being processed.[2] On September 12, 1997, Nathan Chu telephoned Barstow, advised her that Congress Life believed Megan's condition was a preexisting one, and encouraged her to get Dr. Powell's records to persuade Congress Life to reconsider her preauthorization request.
Because Barstow had not disclosed Megan's jaw condition in her application, CBSA advised Barstow that benefits could not be preauthorized. Congress Life sent Barstow a letter, dated September 16, 1997, informing her that she could keep her family's coverage in place if she signed a policy endorsement waiving coverage for Megan's jaw condition,[3] but that if Congress *Page 935 
Life did not receive the waiver by September 30, 1997, it would have "no alternative but to rescind and void all insurance coverage," and that then she and her "children [would] not have any coverage and benefits [would] not be payable for any claims."
Barstow sent Congress Life a letter from Dr. Powell, dated September 18, 1997, that describes as "preposterous" the insurance company's determination that Megan's jaw condition was preexisting. Barstow signed the endorsement under protest, and returned it to CBSA. CBSA did not accept the protest language and sent Barstow a new endorsement to sign. The September 30, 1997, deadline for rescission passed, and Congress Life did not withdraw what Barstow describes as its "threat" of voiding her coverage. Barstow contacted an attorney, who sent Congress Life a letter, dated October 2, 1997, demanding that Barstow be given all the rights to which she claimed she was entitled under the contract. That same day, Barstow's attorney brought this present action against Congress Life, CBSA, and Nathan Chu; however, he did not on that date advise Congress Life that he had filed the lawsuit.
Congress Life claims that it treated Dr. Powell's letter and the attorney's letter as a request for reconsideration. On October 2, Congress Life sought review of the case by an independent medical consultant. Almost two weeks later, on October 15, the consultant advised Congress Life that it did not appear from the records that, at the time Barstow submitted her application for insurance, she knew surgery would be needed. Congress Life was served with process in Barstow's action on October 22.
On November 3, 1997, Congress Life forwarded to Barstow's attorney a letter advising him that Barstow's request for preauthorization for Megan's surgery had been approved.[4] Congress Life reimbursed Barstow for the medical bills she had paid during the review process while her claims had been frozen, and it paid for Megan's surgery in accordance with the terms of the contract.
Barstow's complaint alleged that Congress Life had threatened to rescind the insurance contract and that that "threat" and Congress Life's delay in preauthorizing benefits constituted a breach of contract and that the "threat" and the delay had occurred through bad faith on the part of Congress Life. At trial, Congress Life offered testimony by its expert, Paul Willihnganz, indicating that Congress Life's investigation was consistent with industry custom and practice. The trial court dismissed Barstow's claims against Nathan Chu and CBSA.
The action went to trial on Barstow's claims against Congress Life. At the conclusion of Barstow's case, Congress Life moved for a judgment as a matter of law ("JML"), and it did so again at the close of all the evidence. The trial court denied both motions, and it submitted the case to the jury on Barstow's claims of breach of contract and bad-faith failure to pay. The jury returned a verdict awarding Barstow *Page 936 
$500,000 in compensatory damages and $500,000 in punitive damages. Congress Life moved for a JML or for a new trial, challenging both the finding of liability and the imposition of damages. The trial court denied that motion and left intact the jury's awards of compensatory and punitive damages. The court entered a judgment on the verdict.
Congress Life argues that it was entitled to a JML on the breach-of-contract and bad-faith claims because, it argues, Barstow failed to make a prima facie showing that Congress Life breached a duty owed under the insurance contract and failed to make a prima facie showing that Congress Life had in bad faith failed to conduct a reasonable investigation and review. Congress Life also argues that it is at least entitled to a new trial or to a substantial remittitur, because, it says, the size of the award itself suggests that bias, passion, prejudice, emotion, or some misunderstanding of the facts or the law impermissibly entered the jury's deliberations.
This Court has stated the standard for appellate review of a trial court's ruling on a motion for a JML:
 "The standard of review applicable to a ruling on a motion for [a JML] is identical to the standard used by the trial court in granting or denying [that] motion. Thus, in reviewing the trial court's ruling on the motion, we review the evidence in a light most favorable to the nonmovant, and we determine whether the party with the burden of proof has produced sufficient evidence to require a jury determination.
". . . .
 ". . . In ruling on a motion for a [JML], the trial court is called upon to determine whether the evidence was sufficient to submit a question of fact to the jury; for the court to determine that it was, there must have been `substantial evidence' before the jury to create a question of fact. `[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'"
American Nat'l Fire Ins. Co. v. Hughes, 624 So.2d 1362, 1366-67 (Ala. 1993). (Citations omitted.) See Ex parte Grand Manor, Inc., 778 So.2d 173
(Ala. 2000). On questions of law, this Court indulges no presumption of correctness of the trial court's ruling. State Farm Fire Cas. Co. v.Slade, 747 So.2d 293, 303 (Ala. 1999).
Congress Life first argues that Barstow failed to make a prima facie showing that Congress Life breached a duty under the insurance contract. Barstow argued at trial that Congress Life breached the insurance contract when it sent its September 16, 1997, letter refusing to preauthorize benefits for Megan's jaw surgery and requesting that she sign an endorsement waiving coverage for Megan's jaw condition. Congress Life argues that it was not a breach of contract to send the letter, because, it says, Congress Life reconsidered the request for coverage of Megan's procedure, the policy was never rescinded, and Congress Life did, in fact, preauthorize benefits for the surgery, even though it was not contractually required to do so two years in advance of the procedure.
The bad-faith claim was tried to the jury as an "extraordinary" or "abnormal" bad-faith claim. See State Farm Fire Cas. Co. v. Slade, supra. To recover on such a claim, "the insured must show (1) that the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and (2) that the *Page 937 
insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim." State Farm Fire Cas. Co.v. Slade, 747 So.2d at 318. In Slade, this Court recognized that contractual liability is a prerequisite for liability for bad faith. Therefore, one who cannot prove she was entitled to benefits under an insurance policy cannot recover on a bad-faith claim. See id. at 318 (noting that bad-faith liability is limited to those cases in which the insured is entitled to benefits under the policy).
We conclude that Barstow did not present substantial evidence indicating that Congress Life breached its contract of insurance when it refused to preauthorize Megan's surgery. Therefore, Barstow's bad-faith claim against Congress Life also must fail.
Congress Life asserts that Barstow failed to prove a prima facie case of breach of contract, while Barstow contends that Congress Life's initial refusal, in its September 16 letter, to preauthorize benefits was a breach of the insurance contract.[5] To establish an actionable breach of contract, "a plaintiff must prove: `(1) the existence of a valid contract binding the parties in the action, (2) [her] own performance under the contract, (3) the defendant's nonperformance, and (4) damages.'" Employees' Benefit Ass'n v. Grissett, 732 So.2d 968, 975
(Ala. 1998) (quoting Southern Med. Health Sys., Inc. v. Vaughn,669 So.2d 98, 99 (Ala. 1995)).
Assuming that the evidence established a valid contract between Barstow and Congress Life and that Barstow performed pursuant to the insurance policy, Barstow has not shown that Congress Life failed to perform.
Barstow's case differs significantly from other bad-faith cases that have come before this Court; those other cases have involved claims for benefits that the insurer actually denied. See, e.g., Blackburn v.Fidelity Deposit Co., 667 So.2d 661, 669 (Ala. 1995) (bad-faith refusal to provide defense); Harrington v. Guaranty Nat'l Ins. Co., 628 So.2d 323
(Ala. 1993) (bad-faith refusal to provide uninsured-motorist benefits);Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 (Ala. 1987) (bad-faith denial of health-insurance benefits). This case involves a request for preauthorization that, while initially denied, was ultimately approved. Barstow argues that her preauthorization request was a "claim" and that Congress Life's attempts to show that the request was not a claim is an exercise in "semantics." The evidence however, demonstrates only that the surgery did not occur until more than two years after Barstow had submitted her request, and no evidence indicates that the surgery had been originally scheduled and then delayed. Therefore, at the time Barstow submitted her request, there was no "claim" for benefits presently due.
Even assuming, for the sake of argument, that Barstow's request for preauthorization was a "claim" for benefits under the policy, still we conclude that she failed to demonstrate that Congress Life's *Page 938 
initial refusal to preauthorize the procedure was tantamount to a denial. An insurance company's denial of a claim may be either "express" ("actual") or "constructive." State Farm Fire Cas. Co. v. Slade, supra, 747 So.2d at 317 n. 6. "In Alabama, a plaintiff can establish a constructive denial in two ways: `(1) by showing that the passage of time is so great that the delay alone creates a denial; or (2) by showing sufficient delay in payment coupled with some wrongful intent by the insurance company.'" Id. (Citation omitted.) The evidence here indicates, at most, that Barstow's request for preauthorization was delayed for six weeks. That passage of time, by itself, is not so great that it amounts to a denial.
Moreover, Barstow has not shown sufficient delay in payment coupled with a wrongful intent on the part of Congress Life. In this case, payment was not delayed. Rather, the evidence indicates that Congress Life ultimately approved Barstow's request for preauthorization, that it did so two years before Megan had her surgery, and that it paid the benefits in full when Barstow's claim came due.
Congress Life did not breach its contract with Barstow when it initially refused preauthorization, because it was under no obligation to consider her request for preauthorization in the first place. The policy stated that an insured, like Barstow, must seek a preadmission certification "no more than 30 calendar days" before a hospital admission date. When Dr. Gunter submitted the preauthorization request, the surgery had not been scheduled, and nothing in the record indicates that Congress Life's six-week delay in preauthorizing the procedure was responsible for Megan's two-year wait to have the surgery. Barstow acknowledged at trial that, under the clear and unequivocal language of her policy, Congress Life was under no contractual duty to preauthorize benefits so far in advance. Therefore, in refusing to preauthorize benefits for Megan's surgery, Congress Life did not fail to perform under the insurance policy.
As Congress Life suggests, Barstow confuses her breach-of-contract claim with a claim alleging anticipatory repudiation. "A repudiation is a manifestation by one party to the other that the first cannot or will not perform at least some of his obligations under the contract." E. Allan Farnsworth, Contracts, § 8.21, at 633-34 (1982). If a party "wrongfully states that he will not perform unless the other party consents to a modification of the contract, the statement is a repudiation." Id. at 635, § 8.21. As a general rule, "an anticipatory repudiation gives the injured party an immediate claim to damages for total breach, in addition to discharging his remaining duties of performance." Id. at 630, § 8.20.
To renounce a contract, "a party must demonstrate an intention to refuse performance within the future time allowed by the contract."Nationwide Ins. Co. v. Nilsen, 745 So.2d 264, 268 (Ala. 1998) (citingShirley v. Lin, 548 So.2d 1329, 1334 (Ala. 1989)). While the September 16, 1997, letter was not tantamount to a breach on the part of Congress Life, as Barstow contends, it might have been more properly described as an anticipatory repudiation. The letter itself is phrased in terms of future performance and indicates Congress Life was unwilling to perform under the terms of the policy unless Barstow executed the waiver-of-benefits endorsement. This, in itself, could have given Barstow an immediate claim for damages for breach; however, Barstow did not assert such a theory of recovery in her complaint, and that theory was not tried below or submitted to the *Page 939 
jury. See Kmart Corp. v. Bassett, 769 So.2d 282, 284 n. 1 (Ala. 2000).
Barstow argues that Congress Life's investigation and its ultimate approval of her request for preauthorization cannot affect what she calls Congress Life's initial bad faith and breach of its duties under the insurance policy. However, as we have previously concluded, Congress Life did not deny her request and, therefore, did not breach its duties under the insurance policy. Moreover, even if Congress Life's refusal to preauthorize the procedure were tantamount to a denial of Barstow's claim for benefits under the policy, we nevertheless would conclude that Congress Life had a good-faith basis for that denial.
Congress Life's initial refusal to preauthorize coverage was based on evidence that squarely conflicted with Barstow's answer to a question asking her to disclose any and all "medical advice" received by Megan for her jaw condition within the preceding five years. Barstow had not disclosed that she had sought medical or surgical advice for Megan during the preceding five years; yet, Congress Life discovered that Dr. Powell had been seeing Megan for the jaw condition since 1993 — three years before the application date. In fact, Barstow had sought treatment for Megan's jaw condition earlier on the very same day Barstow applied to Congress Life for the insurance policy.
In Aetna Life Insurance Co. v. Lavoie, supra, 505 So.2d 1050, this Court held that postdenial efforts on the part of an insurer to develop facts that would support a good-faith denial of the claim cannot overcome an initial denial made in bad faith and reiterated on numerous subsequent occasions before the insurer sought pertinent information that was missing from the file. This Court reasoned that "[o]nce the bad faith has occurred, once the duty to use good faith in considering insurance claims has been breached, the insurance company cannot later seek to justify its denial by gathering information which it should have had in the first place." Id. at 1053. However, we do not read Lavoie to hold that an insurance company cannot later reconsider its initial claim and seek to justify payment of that claim by gathering information after the initial denial. In Ex parte Simmons, 791 So.2d 371 (Ala. 2000), this Court stated that "[i]t would stand the logic of Lavoie on its head to say that an insurer acting initially in good faith when denying a claim is thereafter exempt from liability for acting in bad faith if, notwithstanding information subsequently received on reconsideration, it declines in bad faith to alter its position." 791 So.2d at 379. It would also stand the logic of Lavoie on its head to say that an insurer can be held liable for acting in bad faith where it has a good-faith basis for a denial, but then after reconsidering its initial denial decides to alter its position and to pay the claim. What occurred here was not an effort to justify a bad-faith denial. Even though Congress Life had a good-faith basis for initially denying Barstow's preauthorization request, it nonetheless reconsidered that denial and ultimately decided, in good faith, to approve the surgery, and it paid the claim in full when it was submitted two years later. See King v.National Found. Life Ins. Co., 541 So.2d 502 (Ala. 1989) (holding that an insurer did not act in bad faith when, after denying a claim in good faith, it later reconsidered its decision, once it had received evidence indicating that its denial might have been incorrect).
Barstow produced no substantial evidence of a breach of contract by Congress Life. Because she did not prove a breach of contract, her bad-faith claim also must fail. See Slade, 747 So.2d at 318. We *Page 940 
therefore reverse the trial court's judgment and remand the case.
REVERSED AND REMANDED.
Moore, C.J., and Houston, Brown, and Stuart, JJ., concur.
Lyons and Harwood, JJ., concur in the result.
Johnstone and Woodall, JJ., dissent.
[1] Barstow's policy states, in pertinent part:
 "(1) For Non-Emergency Admissions: A physician may recommend that a participant be admitted to hospital for: (a) non-emergency surgery; (b) treatment;. . . . If so, the participant or his/her physician must notify us of the proposed admission no more than thirty calendar days before the proposed admission date, but at least ten calendar days before the proposed admission date. The notice must be in writing or by telephone and provide the following information:
 "(a) patient information: name; birth date; social security number; phone number; and address;
 "(b) insured information: name; social security number; employer or health plan and their address;
"(c) the diagnosis with related symptoms and their duration;
"(d) results of: physical exam; lab tests; and x-rays;
". . . .
 "(f) physician information: name, tax ID or social security number; phone number; address; and medical specialty;
 "(g) name, address and phone number of the facility to which the patient will be admitted;
 "(h) the number of inpatient days the physician feels will be needed;
"(i) the proposed admission date; and
"(j) the date of any proposed surgery or procedure.
 "If the physician fails to provide the information listed above, we may not be able to complete the review. In such case, the admission can't be certified."
[2] The evidence was conflicting as to whether Barstow's request is properly characterized as a "claim." While Barstow's request, on its face, was one for preauthorization, many of Congress Life's internal documents characterize Barstow's request as a "claim."
[3] Congress Life's letter stated in pertinent part:
 "Health insurance coverage was issued to you and your children effective April 7, 1996, under the National Health Care Trust (NHCT), underwritten by Congress Life Insurance Company and administered by Corporate Benefit Services of America, Inc. (CBSA).
 "A preauthorization for benefits has been submitted to CBSA from Dr. Joseph Gunter for treatment requested for Megan. Additional information concerning this preauthorization was obtained pursuant to the authorization in your application. We have determined that pertinent information concerning Megan's health history was not disclosed on your enrollment application.
 "A copy of your April 3, 1996 application is enclosed showing you answered `yes' to question #2 in relation to your February 1996 mammogram. Based upon our review of the additional information provided by Dr. David Powell, it appears that you should have answered `yes' to this question with respect to Megan's health history existing prior to the date you signed your application.
 "If the correct information had been indicated on your application so that the insurer had known of Megan's past medical history, we would have advised you then, as we are now, that in accordance with the insurer's underwriting requirements, coverage could only be issued on Megan with a Waiver of Benefits Endorsement to exclude treatment to the jaw, teeth, and gums.
 "To keep your insurance coverage and your children's insurance coverage in force you will need to sign, date and return the enclosed Waiver of Benefits Endorsement which excludes health insurance benefits on Megan for the jaw, teeth, and gums as of April 7, 1996.
 "If we have not received the signed waiver by September 30, 1997, we will interpret your failure to respond as your refusal to accept these terms for coverage. We will then have no alternative but to rescind and void all insurance coverage as of its original effective date of April 7, 1996 and refund all premium [sic] paid minus any claim payments. This will mean that you and your children will not have any coverage and benefits will not be payable for any claims.
"We regret this action had to be taken."
[4] Justice Johnstone argues in dissent that Congress Life did not reconsider its original decision until after receiving the October 2, 1997, demand letter from Barstow's lawyer. However, the record indicates that the decision to authorize the treatment was reached before Congress Life was served with the summons and complaint. Congress Life reconsidered its decision before it was informed that a lawsuit had been filed.
[5] It is undisputed that Congress Life froze Barstow and her family's coverage pending investigation of the preauthorization request. However, Barstow sought recovery based on Congress Life's delay in preauthorizing Megan's surgery and not on Congress Life's freezing of coverage for other claims. See Kmart Corp. v. Bassett, 769 So.2d 282, 284, n. 1 (Ala. 2000) (noting that this Court will not consider a case on a theory different from that on which it was tried below). Barstow testified:
 "Q: So what your lawsuit is about is that time period during which there was a delay in that preauthorization of Megan's surgery, is that correct?
"A: Yes, sir."