[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 777 
Thomas R. Shelton ("Shelton") and Southeastern Employee Benefit Marketers, P.C., d/b/a Shelton Builders (hereinafter "Shelton Builders") sued Lewis Frederick Clements, Jr., and Michael Keith Hanson, alleging, among other things, breach of contract and defamation. Shelton and Shelton Builders (hereinafter sometimes collectively referred to as "the plaintiffs") amended their complaint to name AmSouth Bank, N.A., as a defendant in the action. Clements answered, denying liability, and filed a counterclaim, alleging that the plaintiffs had breached a contract between him and Shelton Builders. Hanson moved to dismiss the plaintiffs' claims against him. The trial court granted that motion and dismissed the plaintiffs' claims against Hanson.
After receiving ore tenus evidence, the trial court, on January 3, 2001, entered an order in which it determined that the plaintiffs had breached a contract with Clements; the trial court awarded Clements $27,000 in damages on that claim. In its January 3, 2001, order, the trial court also found in favor of Clements on the plaintiffs' claims. On January 4, 2001, the trial court entered an order dismissing the plaintiffs' claims against AmSouth Bank. The January 4, 2001, order disposed of the last claims remaining in this action; therefore, that order constituted a final judgment. The plaintiffs filed a *Page 778 
postjudgment motion, which the trial court denied. The plaintiffs appealed to the Supreme Court; that court transferred the matter to this court, pursuant to § 12-2-7(6), Ala. Code 1975.
Initially, we note that where the trial court has received ore tenus evidence, the trial court's judgment based on that evidence is entitled to a presumption of correctness and will not be reversed on appeal absent a showing that it is plainly and palpably wrong. Alverson v. Trans-CycleIndus., Inc., 726 So.2d 670 (Ala.Civ.App. 1998).
The record indicates that Shelton constructs houses for a living. Shelton is the president of Shelton Builders. The record contains no information regarding the identities of the other officers of Shelton Builders, the number of corporate stockholders or their ownership interests, or the corporation's financial information. Hanson was an employee of Shelton Builders. Hanson coordinated the construction of Clements's house for Shelton Builders; he was the primary contact between Clements and Shelton Builders.
On September 20, 1994, Clements and Shelton Builders entered into a contract pursuant to which Shelton Builders agreed to construct a house for Clements for a total contract price of $111,320. The design plans for Clements's house provided that a portion of the house was to be constructed as a log cabin, and that the remainder of the house was to be of a more traditional style. The contract between Shelton Builders and Clements specified that a "log-cabin kit" was to be used to construct the log-cabin section of Clements's house. The preconstruction estimated appraisal for Clements's house was $100,000. AmSouth Bank agreed to loan Clements $90,000 for the construction of the house. Clements testified that when he entered into the construction contract in 1994, he expected to receive an inheritance of $16,000 in January 1995. In order to obtain the initial capital needed to begin the construction of Clements's house before January 1995, Shelton agreed to inject $16,000 into the construction account for Clements's house. Shelton actually deposited approximately $25,000 into that account. Shelton testified that the extra money was needed because the home-design plans required the purchase of the log-cabin kit, which cost approximately $20,000. In January 1995 Clements received his inheritance of $16,000, and he repaid Shelton's loan to him in that amount. The parties left the remaining $9,000 in the construction-loan account for a time.
It appears that the construction of Clements's house actually began in January 1995. During the construction of the house, one of the log-cabin walls cracked; the record indicates that the parties later learned that the wall had fractured because the specifications for the foundation of the house were not adequate to support the wall. Construction halted until representatives of the manufacturers of the log-cabin kits could recommend a method of repairing the wall and bolstering the foundation to properly support the walls of the log-cabin portion of the house. After the dispute that gave rise to this action, the log-cabin company settled a $2,500 "claim" made by either Shelton or Clements.
Between February 14, 1995, and April 17, 1995, Shelton made six "draws" from the construction loan Clements had obtained from AmSouth Bank; those draws totaled $50,122.80. The record indicates that the terms of the construction loan Clements obtained from AmSouth required that the contractor could make a draw only after completing each stage of the construction of the house. The draw *Page 779 
was designed to pay a stage of construction as it was completed.
On April 21, 1995, Shelton went to AmSouth to make a seventh draw from the construction loan. However, on that date, AmSouth refused to provide Shelton any funds from the construction loan. AmSouth stated the reason for that refusal was that it had inspected the construction on Clements's house and discovered that the stage for which Shelton was seeking payment had not yet been completed. After AmSouth refused to provide further funds from the construction loan, Shelton returned to the construction site. Shelton spoke with Clements and Hanson about AmSouth's refusal to provide further funding for the construction of Clements's house. Clements did not understand the reason for that refusal, and he asked Shelton why the bank had refused to provide further funding. According to Clements, Shelton stated to him that he did not know why AmSouth refused to allow him to make the draw on April 21, 1995.
Clements testified that after he, Shelton, and Hanson met to discuss AmSouth's refusal to provide further draws from the construction account, Shelton told the workers then present at the construction site that there "isn't any more money." Clements testified that Shelton gave each worker $100 in cash and that Shelton told the workers that they could place a lien against Clements's house to guarantee that they would be paid for their work. Clements testified that Shelton told the construction workers that AmSouth would not release additional loan proceeds because "not enough work had been done." Shelton admits that he had told the workers that they could place a lien on Clements's house for the value of the work for which they had not been paid.
Clements testified that after April 21, 1995, he repeatedly asked Shelton for an accounting that could set forth the amounts that had been spent on the construction of his house and the amounts Shelton had withdrawn from the construction loan. Clements testified that approximately one month after April 21, 1995, Shelton gave him a box containing unsorted receipts. Clements testified that he and Hanson spent approximately two weeks sorting through the receipts and construction bills and matching those receipts and bills to the cancelled checks from the construction-loan account. Clements testified that he and Hanson constructed an accurate ledger for the construction account. Clements testified that after he had created the ledger, he and Hanson estimated the cost of completing the construction of his house. Clements stated that he then obtained a $9,000 personal loan in order to fund the completion of the construction stages necessary to once again become eligible to obtain funds from the AmSouth construction loan.
At the trial in this matter, Clements presented evidence indicating that Shelton had used a total of $9,652.58 from the construction account for his personal expenses. Clements's evidence indicated that Shelton had used some funds of that amount for his personal use, and that Shelton had billed certain expenses related to the maintenance of his own house or to other projects to Clements's construction project. Shelton disputed some of that evidence, but he admitted that he had used some funds from the construction-loan account to pay for repairs to his own house and for construction on another project. It is undisputed that the parties considered the approximately $9,000 Shelton had initially invested in the project (the amount in excess of the $16,000 he "loaned" to Clements to begin construction) to be Shelton's money. Therefore, Clements did not object to Shelton's using *Page 780 
that amount for his personal or business use.
Shelton also testified that when he received the $2,500 "settlement" from the log-cabin company, he took $454 from that amount to repay some expenses he had incurred in constructing Clements's house. It is not clear from the record whether Clements received the remainder of the "settlement" proceeds.
After April 21, 1995, Shelton performed no further work on Clements's house. The parties dispute whether Shelton was unwilling to complete the project and simply did not return to the worksite, or whether Clements refused to allow Shelton to continue working on the project. Shelton testified that Clements refused to discuss the construction project with him after April 21, 1995, and that he later learned that Clements had undertaken the completion of the construction project himself. Shelton stated that after April 21, 1995, an AmSouth employee indicated to him that he and Clements would have to work together to work out the construction scheduling problems. Shelton maintained that Clements had refused to travel with him to the bank to meet with an AmSouth representative to work out the problems with the financing of the construction project.
Clements testified that after April 21, 1995, he was unwilling to invest any more money in the construction project until he could ascertain where and on what the funds already withdrawn had been spent. Clements testified that he invested the additional $9,000 to continue the construction project only after creating the ledger and estimating the cost of finishing the construction of his house. Clements testified that it took him weeks to construct the ledger, and that Shelton did not return to work on the construction site after he had completed the ledger.
Clements, with Hanson's assistance, completed the construction project using the same subcontractors initially hired by Shelton. In order to save money and complete the construction of his house for an amount close to the original contract price, Clements substituted some costly materials with less expensive materials. Those substitutions resulted in a savings of approximately $12,000. However, even with that amount of cost savings, the total cost of the construction of Clements's house totaled $117,629.73, which was approximately $6,000 in excess of the original contract price of $111,320.
Shelton testified that he had used his personal charge accounts to purchase some materials for the construction of Clements's house. Shelton admitted that he instructed the merchants from whom he had purchased those materials to place liens on Clements's house in order to obtain payment for those materials. Those liens delayed Clements's ability to obtain additional draws from AmSouth; therefore, they delayed the completion of the construction of Clements's house. Those liens were later resolved, and several of the merchants obtained judgments against Shelton.
Shelton testified that he personally has constructed between 70 to 80 houses, but that Clements's house was the first house built by Shelton Homes. Clements presented evidence indicating that Shelton had stated that if he did not make a profit on the construction of Clements's house, he would simply bankrupt that "little corporation," i.e., Shelton Homes. Shelton testified that he did not recall making that statement. Hanson testified that Shelton had at one point told him that he was worried that there was not enough money remaining in the construction-loan account to finish the construction of the house, and that "he was going to try and get out of *Page 781 
the contract." Shelton denied that allegation; at trial, he insisted that he had intended to complete the construction of Clements's house.
Shelton testified that AmSouth had provided funds as the various construction stages were completed. He stated that the project had progressed well, but he explained that the construction project appeared to be behind schedule, applying AmSouth's financing schedule, because the project had required a huge initial outlay of capital in order to purchase the log kit for the log-cabin portion of Clements's house. Shelton maintained that AmSouth's standard construction-account form did not work well for providing funding to finance a log-cabin home.
Shelton also testified that he was not aware that if he finished the work required by AmSouth, he could have obtained the next draw. Shelton initially testified that he could have funded that additional construction in order to again become eligible for a draw. However, he later testified that Shelton Builders had no assets and that he or it would have had to borrow the money necessary to complete the construction stage as required by AmSouth.
On appeal, the plaintiffs first argue that the trial court erred in finding that both Shelton and Shelton Builders had breached the parties' 1994 construction contract. The plaintiffs argue that the evidence does not support the trial court's decision to pierce Shelton Builders' corporate veil so as to impose personal liability upon Shelton.
 "A corporation is a legal entity that exists separate from its shareholders, and its actions and obligations are to be considered separately from those of its shareholders. Wright v. Alan Mills, Inc., 567 So.2d 1318
(Ala. 1990). The corporate structure is intended to protect shareholders and officers from liability arising from the operation of the corporation. Messick v. Moring, 514 So.2d 892, 894 (Ala. 1987). The ability to pierce a corporate veil and impose personal liability on the corporation's shareholders arises from an equitable doctrine and `"furnishes a means for a complainant to reach . . . [an] individual upon a cause of action that otherwise would have existed only against the . . . corporation." 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 41.10 (perm. ed. rev. vol. 1999).' Ex parte Thorn, 788 So.2d 140, 145 (Ala. 2000). Piercing the corporate veil to impose personal liability on a corporation's shareholder is not a power that is exercised lightly. First Health, Inc. v. Blanton, 585 So.2d 1331, 1334 (Ala. 1991)."
Gilbert v. James Russell Motors, Inc., 812 So.2d 1269, 1273
(Ala.Civ.App. 2001). The fact that a party owns all or a majority of the stock in a corporation does not alone destroy the corporate entity, nor does the fact that the corporation is not sufficiently capitalized alone work to defeat the corporate existence. Ramko, Inc. v. Lander,707 So.2d 645 (Ala.Civ.App. 1997). "`To pierce the corporate veil, a [party seeking to pierce the corporate veil] must show fraud in asserting the corporate existence or must show that recognition of the corporate existence will result in injustice or inequitable consequences.'" EconMktg., Inc. v. Leisure Am. Resorts, Inc., 664 So.2d 869, 870 (Ala. 1994) (quoting Backus v. Watson, 619 So.2d 1342, 1345 (Ala. 1993), citingWashburn v. Rabun, 487 So.2d 1361 (Ala. 1986), and Cohen v. Williams,294 Ala. 417, 318 So.2d 279 (1975)). Also, where a corporation is "controlled by persons who use the corporation as a mere instrumentality, a court is not required to recognize the corporation as a separate *Page 782 
entity." Thorne v. C S Sales Group, 577 So.2d 1264, 1266 (Ala. 1991).
In this case, it is undisputed Shelton Builders had no assets. The record indicates that Shelton used the AmSouth construction-loan account to pay some of his own minor personal expenses. In addition, Clements presented evidence that Shelton had billed Clements for certain equipment and labor related to other projects. It is undisputed that Shelton purchased certain materials for the construction of Clements's house on his personal credit cards, and that, when he did not pay those debts, he later instructed those personal creditors to place liens on Clements's house. Further, Shelton withdrew some of the proceeds of the $2,500 "settlement" from the log-cabin company to pay expenses related to the construction of Clements's house for which Shelton was personally liable; after first paying his own expenses, Shelton then forwarded the remainder of those funds to Clements. Thus, the record contains evidence to support a conclusion that Shelton Builders was undercapitalized and that, by involving his own personal finances in the construction project for which Shelton Builders had contracted, Shelton had commingled his funds with those of the corporation. We conclude that that evidence, together with the evidence indicating that Shelton intended to file a petition in bankruptcy for Shelton Builders if it did not earn a profit on the construction of Clements's house and that Shelton had informed Hanson that he would like to "get out of" the contract between Shelton Builders and Clements, would support a conclusion that Shelton had operated Shelton Builders merely as an instrumentality or alter ego of himself.See Thorne v. C S Sales Group, supra. Whether a party is an alter ego of his corporation is a question of fact to be resolved by the fact-finder. Woods v. Commercial Contractors, Inc., 384 So.2d 1076, 1079
(Ala. 1980). The trial court did not make any specific findings of fact with regard its decision to pierce the corporate veil to impose personal liability on Shelton. In the absence of specific findings of fact, this court must presume that the trial court made those factual findings that would support its judgment. Transamerica Commercial Fin. Corp. v. AmSouthBank, N.A., 608 So.2d 375 (Ala. 1992). Also, we conclude that the evidence tends to support a conclusion that under the facts of this case, allowing Shelton to avoid personal liability would "result in injustice or inequitable consequences" for Clements. See Econ Mktg.,Inc. v. Leisure Am. Resorts, Inc., 664 So.2d at 870. Given the evidence in the record on appeal, we conclude that the evidence supports a finding that Shelton should be personally liable for the damages the trial court awarded Clements on his breach-of-contract claim.
The plaintiffs next argue that the trial court erred in determining that they, rather than Clements, breached the contract between Shelton Builders and Clements. In order to prevail on his breach-of-contract claim, Clements was required to present evidence in support of the following elements of his claim: (1) the existence of a valid contract between Shelton Builders and him; (2) his own performance under that contract; (3) Shelton Builders' breach, or failure to perform under the contract; and 4) damage sustained as a result of Shelton Builders' nonperformance. Southern Med. Health Sys., Inc. v. Vaughn, 669 So.2d 98,99 (Ala. 1995). The plaintiffs do not dispute the existence of a valid contract between Shelton Builders and Clements. Rather, the plaintiffs' argument in their brief on appeal is dedicated to their contention that the evidence demonstrates that Clements failed to perform under the contract. *Page 783 
The plaintiffs argue that the evidence demonstrates that Clements "repudiated" the contract. See Congress Life Ins. Co. v. Barstow,799 So.2d 931, 938 (Ala. 2001) ("`A repudiation is a manifestation by one party to the other that the first cannot or will not perform at least some of his obligations under the contract.'" Quoting E. Allan Farnsworth,Contracts, § 8.21, at 633-34 (1982)). The plaintiffs maintain that Clements's alleged repudiation of the contract between Shelton Builders and him constituted a breach of that contract, and that that alleged repudiation prevented their performance under the contract. The plaintiffs point to Shelton's testimony that he wanted to meet with Clements and an AmSouth representative to reinitiate the bank's funding of the construction project, but that Clements would never do so. However, Clements testified that he was unwilling to provide Shelton further funds to complete the project until Shelton had explained how the money already spent had been used; Clements stated that it was almost a month before Shelton and the bank provided him with the information he needed to create a ledger and to make that determination. Clements testified that Shelton did not return to manage the construction project; Shelton testified that Clements would not discuss the project with him after April 21, 1995. Thus, the evidence in the record as to why Shelton and Shelton Builders stopped working on the construction of Clements's house conflicted. The evidence also conflicted in regard to whether either party had attempted to work out the problems with the financing of the construction of Clements's house.
The evidence regarding the parties' performance under the contract regarding almost every pertinent fact was in conflict. It is the duty of the trial court to resolve conflicts in the evidence. Jones v. LeFlore,421 So.2d 1287, 1288 (Ala.Civ.App. 1982). After receiving the ore tenus evidence, the trial court determined that the plaintiffs had breached the contract. There is sufficient evidence in the record on appeal to support that determination. Therefore, we are unable to say that the trial court's judgment in favor of Clements on the plaintiffs' breach-of-contract claim was plainly and palpably wrong. See Alverson v.Trans-Cycle Indus., Inc., supra.
The plaintiffs' last argument is that the trial court abused its discretion in its award of damages because, they allege, Clements did not mitigate his damages. Whether a party has mitigated his damages is a factual question. Carnival Cruise Lines v. Goodin, 535 So.2d 98 (Ala. 1988). "Generally, an injured party is required to mitigate his damages in a reasonable manner consistent with what an ordinarily prudent person would do in similar circumstances." Id. at 103. A party may not recover for any part of his loss that was caused or increased by his failure to act reasonably. Kuruvilla v. Red Bay Hosp., 497 So.2d 829 (Ala.Civ.App. 1986).
In its January 3, 2001, order finding in favor of Clements on his counterclaim, the trial court stated, in part:
 "The assessing of damages is somewhat difficult in this case. This is due to the fact that the nature and extent of some items of damages were or could have been substantially altered by the conduct of one party or the other. However, from a fair and equitable analysis based on the totality of the circumstances, the Court is of the opinion that [Clements] is due to recover of the Plaintiffs the sum of $27,500."
We note that our supreme court recently characterized the defense of failure to mitigate damages as an affirmative defense. Prudential BallardRealty Co. v. Weatherly, 792 So.2d 1045, 1048 (Ala. 2000). *Page 784 
In this case, the plaintiffs did not raise in their answer to Clements's counterclaim the defense of the failure to mitigate damages. Therefore, under the authority of Prudential Ballard Realty Co. v. Weatherly, we conclude that that defense was waived. See also Rule 8(c), Ala.R.Civ.P.;Sperau v. Ford Motor Co., 674 So.2d 24 (Ala. 1995).
Assuming, however, that the issue whether Clements appropriately mitigated his damages was properly before the trial court, we note that the trial court's judgment does not set forth the calculations it used in reaching its damages award. However, a trial court is not required to assess damages with mathematical precision. Chestnut v. Laramore,560 So.2d 1070 (Ala.Civ.App. 1990). "All that is required is that the evidence, with as much certainty as the situation permits, lay a foundation with which the trier of fact may make a fair and reasonable estimate of the amount of damages." Farmer v. Strother, 423 So.2d 252,253 (Ala.Civ.App. 1982) (citing 22 Am. Jur.2d 44, Damages § 25 (1965), and United Bonding Ins. Co. v. W.S. Newell, Inc., 285 Ala. 371,232 So.2d 616 (1970)). We cannot determine from the trial court's judgment whether it considered the issue whether Clements had appropriately mitigated his damages. Where a trial court fails to make specific factual findings regarding a particular issue, this court must assume that it made those findings necessary to support its judgment.Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., supra. We must assume that the trial court, in determining the damages it would award, concluded that Clements had mitigated his damages. Therefore, we next address whether the record on appeal supports that determination.
Shelton testified that after April 21, 1995, he discovered a roofing contractor that would perform the roofing work for several hundred dollars less than the original roofing contractor. Shelton also testified that he discovered another contractor who could complete the remaining carpentry work more quickly, and therefore less expensively, than the carpenter who ultimately completed the work on Clements's house. Clements testified that in completing the construction of his house, he substituted the more expensive materials or features for which he had originally contracted for less expensive alternatives. Clements also used the subcontractors that Shelton had originally hired. We cannot say that Shelton has established that Clements's actions aggravated his damages or increased his loss. See Kuruvilla v. Red Bay Hosp., supra. We must conclude that the evidence in the record supports the trial court's conclusion that Clements, in using the subcontractors originally hired by Shelton, acted in a "reasonable manner consistent with what an ordinarily prudent person would do in similar circumstances." Carnival Cruise Linesv. Goodin, 535 So.2d at 103. Therefore, we cannot say that the plaintiffs have established that the trial court erred in refusing to reduce its damages award based on Clements's alleged failure to mitigate his damages.
AFFIRMED.
Yates, P.J., and Crawley, Pittman, and Murdock, JJ., concur. *Page 785