On June 18, 2003, David J. Anderson sued Richard C. Amberson and Amberson Construction, Inc. ("Amberson Construction"), alleging fraud, economic duress, and breach of contract.[1]
Amberson and Amberson Construction (hereinafter "the defendants") moved to dismiss the action or, in the alternative, to stay the proceedings and compel arbitration. In their motion to dismiss, the defendants alleged, in pertinent part, that on March 10, 2003, the parties had entered into a binding "Settlement Agreement and Mutual Release" (hereinafter "the release"), which, they asserted, precluded Anderson's action, and, in the alternative, that the parties were bound by an arbitration agreement. The defendants submitted in support of their motion to dismiss a copy of the release.
On August 22, 2003, Anderson filed a response to the motion to dismiss and submitted affidavits in support thereof. In his response, Anderson argued, in relevant part, that the release should not be enforced because, he alleged, it was procured by fraud and economic duress. Anderson also argued that the arbitration provision was inapplicable to this dispute. We note that the arbitration provision is not at issue in this appeal.
On October 28, 2003, the trial court granted the defendants' motion to dismiss. Anderson filed a motion to alter, amend, or vacate the judgment; that postjudgment motion was deemed denied by operation of law pursuant to Rule 59.1, Ala. R. Civ. P. Anderson timely appealed; this case was transferred to this court by the supreme court pursuant to § 12-2-7(6), Ala. Code 1975.
It is well-settled law that "[w]hen materials outside the pleadings accompany a motion to dismiss, the trial court is `not bound to limit itself to the pleadings.'" Phillips v. AmSouthBank, 833 So.2d 29, 31 (Ala. 2002) (quoting Papastefan v. B LConstr. Co., 356 So.2d 158, 160 (Ala. 1978)). In Phillips, supra, our supreme court stated:
 "`[W]here matters outside the pleadings are considered on a motion to dismiss, the motion is converted into a motion for summary judgment . . . regardless of its denomination and treatment by the trial court.' Boles v. Blackstock, 484 So.2d 1077, 1079 (Ala. 1986). Indeed, unless the trial court expressly declines to consider the extraneous material, its conclusions may be construed to include the extraneous material. Cf. Ex parte Liberty Nat'l Life Ins. Co., 825 So.2d 758, 763 n. 1 (Ala. 2002) (trial court's express refusal to consider extraneous material constituted an exclusion)."
Phillips, 833 So.2d at 31 (emphasis omitted). The defendants' motion was characterized as a "motion to dismiss." However, the foregoing authority clearly indicates that that motion was converted to a motion for a summary judgment by the parties' submission of evidence. Phillips, 833 So.2d at 32.
This court has set out the standard for reviewing a motion for summary judgment as follows:
 "A summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56, Ala. R. Civ. P.; Bussey v. John Deere Co., 531 So.2d 860 (Ala. 1988). `When the movant makes a prima facie showing that those two conditions are *Page 813 
satisfied, the burden shifts to the non-movant to present "substantial evidence" creating a genuine issue of material fact.' Ex parte Alfa Mut. Gen. Ins. Co., 742 So.2d 182, 184 (Ala. 1999). `[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). In reviewing a summary judgment, this court must review the record in a light most favorable to the nonmoving party and must resolve all reasonable doubts concerning the existence of a genuine issue of material fact against the moving party. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala. 1990)."
Bain v. Gray, 835 So.2d 1034, 1037 (Ala. Civ.App. 2002).
The record, viewed in the light most favorable to Anderson, reveals the following pertinent facts. On May 7, 2002, the parties entered into a contract for the defendants to construct a residence for Anderson and his family in the Greystone Legacy subdivision in Shelby County. The contract price for the construction of the house was $1,860,628. The record indicates that at some point during the construction of the house, Anderson's wife, Dawn R. Anderson ("Dawn"), and Amberson began a romantic relationship.[2] According to the allegations made by Anderson, Dawn and Amberson conspired to defraud him.
Throughout the record, Anderson argued that Amberson, individually and on behalf of Amberson Construction, sometimes acting in collusion with Dawn, carried out numerous fraudulent acts against him. Anderson alleged, among other things, that the defendants executed false change orders, filed fraudulent liens against the house, utilized faulty and substandard materials in the construction of the house, obtained a fraudulent certificate of occupancy for the house from the City of Hoover, and failed to perform punch-list items. Anderson contended that the defendants, through those purported wrongful actions, coerced him to sign the release. As a result, Anderson argued, the release was void.
According to Anderson, a total of 126 change orders to the construction contract were executed; those change orders increased the price of the construction of the house from $1,860,628 to $2,350,000. The record contains copies of five change orders that were executed by Amberson and Dawn; those change orders totaled $24,173.21. The record indicates that the amounts reflected in those five change orders were unrelated to the construction of the house. It appears that rather than using the amounts reflected in those five change orders toward the construction of the house, Amberson gave Dawn the proceeds from those five change orders. Dawn stated in her affidavit that she used the proceeds from those change orders to pay her divorce attorney and that she intended those amounts to be a personal loan to her rather than a debt owed to Amberson by Anderson.
Anderson stated in his affidavit that, during the construction process, he began disputing several of the change orders and expressed concern regarding the quality of the construction. Anderson alleged that in the midst of those disputes, Amberson Construction filed two "bogus" liens on the *Page 814 
house. According to Anderson, the defendants filed the liens solely to obtain leverage in the parties' negotiations. Anderson presented the affidavit of Joanne Peck, who stated in her affidavit that she was Anderson's personal assistant in charge of Anderson's finances. Peck "kept track" of the change orders and the progress payments in regard to the construction of the house. Peck stated that, on at least two occasions, Amberson claimed that Amberson Construction was due amounts for work performed in change orders, even though these amounts had allegedly already been paid. According to Peck, Amberson threatened to file liens to enforce the payment of amounts that had already been paid. The record contains copies of two liens filed against the house; however, it is not clear whether the liens contained in the record are those that Anderson contends were fraudulently filed.
When the construction was completed, Wade Lumbaugh, a building official for the City of Hoover, performed a final inspection of the house. Pursuant to the inspection, Lumbaugh, on behalf of the City of Hoover, issued a certificate of occupancy for the house; that certificate of occupancy was dated February 28, 2003. Pursuant to the terms of the construction contract, the issuance of the certificate triggered the final payment due under the construction contract; that payment was to be made within three calendar days of the issuance of the certificate. The record indicates that Anderson did not make the final payment of $142,000 within the specified time period following the February 28, 2003, issuance of the certificate.
On March 3, 2003, the defendants sued Anderson and Dawn for the $142,000 remaining balance due under the construction contract. The parties subsequently entered into the aforementioned release. Pursuant to the terms of the release, Anderson tendered $119,602 as final payment on the construction contract and the defendants dismissed their March 6, 2003, action, released the liens filed against the house, and agreed to perform the repairs on the punch list. According to Amberson, the release was drafted by Anderson's counsel, who negotiated the terms of the release with the defendants' counsel. The release stated, in relevant part:
 "Amberson and Amberson Construction claim monetary damages, including both compensatory, consequential and incidental damages as well as attorney's fees, from Anderson and Dawn, as evidenced by the Complaint filed in the [March 6, 2003] Lawsuit. Anderson denies liability to Amberson and/or Amberson Construction and, instead, claims monetary damages from Amberson and/or Amberson Construction with respect to the quality of the construction, claimed slander of title and related lien improprieties, tortious interference with contractual relationships, and other claims and allegations which have not but could be addressed and asserted by way of Counterclaim in the Lawsuit. Amberson and Amberson Construction deny liability to Anderson.
 "Amberson, Amberson Construction and Anderson have agreed to settle and terminate the above-described Lawsuit, the disputes between the respective parties related to the Agreement, lien claims, stopped payment of check(s), matters relating to the construction loan with SouthTrust Mortgage Corporation, and any and all claims or allegations of whatever nature that Amberson and/or Amberson Construction may have against Anderson or that Anderson may have as against Amberson or Amberson Construction arising out of, referable or pertaining in any way to the actions, inactions, circumstances and events involved in the Lawsuit described above or *Page 815 
which could have been asserted in such Action. In keeping with the settlement entered into between these parties, the Lawsuit will be dismissed with prejudice, with each party to bear their own respective costs, and any and all liens filed which could have been filed with the Probate Court of Shelby County, Alabama will be released."
(Emphasis added.) The parties further agreed to a "pro tanto release and discharge" from
 "any and all claims, demands, actions, causes of action, suits, costs, damages, benefits, expenses, accruals, compensation and liabilities of any kind, character and description, whether direct or consequential, at law or in equity, whether known or unknown, foreseen or unforeseen by Anderson which against Amberson and/or Amberson Construction (or either of them) he may now have or have ever had as pertains to, arises or results from, or in any manner is incident to any of the matters, things or events growing out of or encompassed within the [March 6, 2003] Lawsuit identified as Civil Action CV 03-290, described above, the Purchaser/Contractor Agreement described above, liens (recorded or unrecorded), change orders (authorized or unauthorized, oral or written) related to the Residence of which otherwise has arisen or could have arisen at any time from the beginning of time until the date of this Settlement Agreement and Mutual Release."
Approximately three months after the defendants filed the March 6, 2003, action, and after the parties had executed the release, Anderson commenced the action that is the subject of this appeal.
In his brief on appeal, Anderson contends that the trial court erred in entering a summary judgment in favor of the defendants because, he argues, he presented substantial evidence that a genuine issue of fact existed with regard to the validity of the release. Anderson's primary argument on appeal is that the release was part of an ongoing or continuing fraud perpetrated against him by the defendants. Anderson also argues that the defendants' alleged fraudulent acts created undue economic pressure and duress that led him to sign the release. In the alternative, Anderson argues that the trial court erred in entering a summary judgment as to Anderson's breach-of-contract claim in regard to the performance of the punch-list items. We now address each of his arguments on appeal.
 I. Fraud
Anderson's argument on appeal regarding this issue is twofold. First, Anderson argues that the defendants committed specific fraudulent acts against him that led him to sign the release. Secondly, Anderson argues that the specific acts, taken as a whole, constituted an ongoing or continuing fraud against him, which led him to sign the release.
Anderson argues that the defendants filed false liens and obtained a fraudulent certificate of occupancy in order to coerce or force him to sign the release. We interpret Anderson's argument as contending that the defendants committed fraud in the inducement. "Fraud in the inducement consists of one party's misrepresenting a material fact concerning the subject matter of the underlying transaction and the other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action." Oakwood Mobile Homes,Inc. v. Barger, 773 So.2d 454, 459 (Ala. 2000) (emphasis omitted). Our supreme court, addressing a claim of fraud in the inducement, stated that: *Page 816 
 "It is fundamental to an action for fraud that the representee must have been deceived by and relied upon the representation as an inducement to his action or non-action."
Old Southern Life Ins. Co. v. McConnell, 52 Ala.App. 589, 595,296 So.2d 183, 187 (Civ. 1974) (citing Ansley v. Bank ofPiedmont, 113 Ala. 467, 21 So. 59 (1896)).
Anderson argues that the certificate of occupancy was a material representation that the house passed its final inspection. Anderson claims that his reliance on the certificate was justifiable, in that no reasonable person would doubt that a house that had passed a final inspection and had received a certificate would contain the glaring defects that he alleges are present in the house. This argument fails in two aspects. First, Anderson failed to explain how an alleged fraudulent certificate of occupancy constitutes a misrepresentation made by thedefendants. Secondly, Anderson failed to explain how he was deceived by or relied on the alleged fraudulent certificate. The release states that Anderson disputed the quality of the construction; however, by signing the release, he waived any claims with regard to the quality of the construction. Anderson's own affidavit and the language of the release indicate that Anderson was aware that the house contained certain defects at the time he signed the release; thus, his argument that he was deceived by the certificate of occupancy is not supported by the record.
Anderson also argues that the defendants filed fraudulent liens on the house to pressure him to sign the release. Anderson cites his own affidavit, in which he states that the defendants filed the two liens on the house solely to obtain additional leverage during the parties' negotiation process. Anderson also cites Joanne Peck's affidavit, wherein Peck stated that Amberson had threatened to file liens on the house to enforce some payments that she says had already been made. That evidence does not provide substantial evidence that the liens were fraudulent. Anderson presented no evidence indicating that he had paid or did not owe the amounts reflected in the two liens.
Accordingly, we conclude that Anderson did not present substantial evidence supporting his claim of fraud in the inducement pertaining to the release. Although Old Southern
states that fraud in the inducement is generally a question of fact for the jury, we conclude that Anderson failed to present substantial evidence with regard to this argument to overcome the defendants' prima facie case. Therefore, we cannot say that Anderson has demonstrated error.
We next address Anderson's argument that the defendants perpetrated an "ongoing fraud" against him by allegedly using inferior building materials, executing wrongful change orders, and filing fraudulent liens. Anderson cites no Alabama caselaw in support of his ongoing-fraud argument. Instead, he directs this court to Lopez-Infante v. Union Central Life Insurance Co.,809 So.2d 13 (Fla.Dist.Ct. App. 2002), and Lowe v. Presley,86 Ga. App. 328, 71 S.E.2d 730 (1952), for the proposition that an ongoing fraud continues until the plaintiff is no longer suffering the consequences of the fraud. In Lopez-Infante andLowe, however, the issue of "ongoing fraud" was relevant only as to the issue of when the alleged frauds could or should have been discovered for the purposes of determining whether the plaintiffs' claims were barred by the applicable statutes of limitations. Anderson does not contend that he could not have discovered the fraud earlier; rather, he contends that the defendants' intent to *Page 817 
perpetrate fraud can be discerned from the continued acts.
However, the record clearly reveals that at the time he signed the release Anderson recognized the claims that he asserts against the defendants in this action. The language of the release is conspicuous in that respect:
 "Anderson . . . claims monetary damages from Amberson and/or Amberson Construction with respect to the quality of the construction, claimed slander of title and related lien improprieties, tortious interference with contractual relationships, and other claims and allegations which have not but could be addressed and asserted by way of Counterclaim in the Lawsuit."
In the instant case, Anderson failed to present evidence indicating that he was coerced by the defendants into signing the release. Anderson may have presented evidence of wrongful acts concerning the underlying construction contract. However, we cannot say that Anderson has presented evidence indicating that the continued alleged wrongful acts or fraud induced him to sign the release.
In conclusion, we cannot say that Anderson presented substantial evidence regarding his fraud claim to rebut the defendants' prima facie showing that Anderson's action was barred by the release. Accordingly, we hold that Anderson has not demonstrated that the trial court erred with regard to this issue.
 II. Economic Duress
Anderson argues that the defendants' alleged fraudulent acts created undue economic pressure and duress that led him to sign the release. The elements of economic duress are defined in the case of International Paper Co. v. Whilden, 469 So.2d 560 (Ala. 1985), as "(1) wrongful acts or threats; (2) financial distress caused by the wrongful acts or threats; (3) the absence of any reasonable alternative to the terms presented by the wrongdoer."469 So.2d at 562.
In International Paper, supra, International Paper hired Whilden to cut timber from property owned by a third party. During the cutting project, Whilden entered into a separate contract to purchase timber from International Paper; Whilden obtained a loan from a bank in order to finance the contract to purchase the timber. During the cutting project, International Paper discovered that some trees that were not supposed to be harvested (hereinafter "the unmarked trees") were in fact cut down; the property owners threatened a legal action for the destruction of the unmarked trees. When the project ended, International Paper refused to pay Whilden $7,000 it owed Whilden unless Whilden agreed to execute a "blanket indemnity agreement" that provided that Whilden, rather than International Paper, was liable to the property owners for the destruction of the unmarked trees. International Paper, 469 So.2d at 562. Whilden signed the indemnity agreement because, he said, International Paper represented to him that only 30 trees had been improperly harvested and because he needed the $7,000 to repay the bank loan. The property owners sued International Paper, which filed a third-party complaint against Whilden, citing the indemnity agreement as a basis for its third-party claim. International Paper contended that Whilden knew that 650 trees, rather than 30, had been improperly cut down and that the property owners' claim for destruction of property totaled $40,000. Whilden denied that allegation and testified that he would not have signed the indemnity agreement had he understood that more than 30 trees had been improperly cut down. International Paper,469 So.2d at 564. *Page 818 
The trial court determined that International Paper was at fault in causing the destruction of the unmarked trees and that Whilden was not at fault and not liable to International Paper because, it concluded, Whilden had executed the indemnity agreement under economic duress. Our supreme court affirmed, citing the necessity for Whilden to repay its bank loan, International Paper's superior bargaining power, and its conclusion that International Paper had failed to disclose to Whilden the fact that 650 trees had been improperly cut down. In so holding, our supreme court stated:
 "Tantamount to a claim of economic duress is the wrongful pressure exerted by one party which overcomes the will of another.
 "`It is said that economic duress must be based on conduct of the opposite party and not merely on the necessities of the purported victim. The entering into a contract with reluctance or even dissatisfaction with its terms because of economic necessity does not, of itself, constitute economic duress invalidating the contract. Unless unlawful or unconscionable pressure is applied by the other party to induce the entering into a contract, there is not economic compulsion amounting to duress. Chouinard v. Chouinard, 568 F.2d 430 (5th Cir. 1978).'
 "Board of School Commissioners of Mobile County v. Wright, 443 So.2d 35, 38-39 (Ala.Civ.App.), rev'd on other grounds, 443 So.2d 40 (Ala. 1983)."
International Paper, 469 So.2d at 563.
In Clark v. Liberty National Life Insurance Co.,592 So.2d 564 (Ala. 1992), the employee had been working for the insurance company for several years when he entered into a new employment contract; that new contract differed from the previous contract in that it included a covenant not to compete. The primary dispute in the case concerned the covenant not to compete. However, as one issue in his appeal, the employee contended that he had signed the new employment contract under duress because his entering into that contract was required in order that he be allowed to continue his employment. Our supreme court concluded that the insurance company had not applied any unlawful pressure on the employee to induce him to sign the contract and that the employee's continued employment constituted consideration for his signing the contract. In so holding, the supreme court citedInternational Paper, supra, for, among other things, the proposition that the doctrine of economic duress applies only in unusual or extraordinary situations where "unjustified coercion" is utilized in order to induce the party to sign the contract.Clark v. Liberty Nat'l Life Ins. Co., 592 So.2d at 567.
In his brief on appeal, Anderson argues that he entered into the release under economic duress. Anderson points to the parties' construction agreement that provided for a liquidated-damages penalty of $250 per day and a 1.5% monthly interest on the unpaid amounts due after the issuance of the certificate of occupancy. Anderson also refers to his affidavit in which he stated that the certificate of occupancy imposed a high economic burden upon him, including the possibility that the bank from which he obtained his construction loans would not extend permanent financing to him if he did not pay the defendants the final amount due on the construction contract within three days of the issuance of the certificate. However, while Anderson has presented evidence indicating that he signed the release due to economic necessity, he has not presented evidence of a wrongful act on the part of the defendants that induced him to sign *Page 819 
the release. "`[E]conomic duress must be based on conduct of the opposite party and not merely on the necessities of the purported victim.'" International Paper, 469 So.2d at 563.
Further, the record indicates that Anderson's own attorney allegedly drafted and negotiated the release. At the time he signed the release, Anderson was aware of the claims he now brings against the defendants. Anderson could have executed a release with more favorable terms, perhaps reserving certain claims against the defendants, or he could have abstained from signing the release altogether; however, he chose to sign the release and waive his claims against the defendants. Given the foregoing, we cannot say that Anderson has demonstrated error with regard to this issue.
 III. Breach of Contract
Anderson's alternative argument on appeal is that the release constituted a contract between the parties and that the defendants breached that contract by failing to perform the repairs listed on the punch list.
This court has stated that,
 "[i]n order to prevail on his breach-of-contract claim, [the plaintiff] was required to present evidence in support of the following elements of his claim: (1) the existence of a valid contract between [the defendants] and him; (2) his own performance under that contract; (3) [the defendants'] breach, or failure to perform under the contract; and (4) damage sustained as a result of [the defendants'] nonperformance."
Shelton v. Clements, 834 So.2d 775, 782 (Ala.Civ.App. 2002) (citing Southern Med. Health Sys., Inc. v. Vaughn,669 So.2d 98, 99 (Ala. 1995)).
The parties' release states, in pertinent part:
 "Amberson Construction agrees to complete punch-list items related to the residence within seven (7) days. Further, all warranties related to the residence (expressed in the Agreement or otherwise), including those warranties concerning waterproofing, the foundation, the electrical, heating, air conditioning systems and one-year construction warranty, by or from Amberson Construction or any subcontractor or supplier shall survive this Settlement Agreement and Mutual Release and shall inure to the benefit of Anderson or his devisee or successor owner of the residence."
Anderson argues that he performed under the release by tendering the amount of $119,602 to the defendants but that the defendants failed to complete the items on the punch list. The parties' construction contract provides, in relevant part:
 "A punch list containing any items which are not complete or are nonconforming at the time of the completion shall be submitted to the contractor prior to occupancy of the residence by the purchaser."
(Emphasis added.)
The defendants, in their brief on appeal, do not dispute Anderson's argument that they have not performed the punch-list items pursuant to the release. Instead, the defendants argue, in pertinent part, that Anderson failed to timely provide a punch list. However, Amberson stated in his own affidavit that the punch list was prepared by Anderson before the final closing of the house. In light of the evidence before the trial court as to the breach-of-contract claim, we conclude that a genuine issue of material fact exists as to whether the defendants completed the items on the punch list as required by the release. In reaching this determination, the court does not comment on whether *Page 820 
Anderson may ultimately prevail on his breach-of-contract claim. However, given the evidence in the record, we must reverse the summary judgment with regard to that claim.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
YATES, P.J., and CRAWLEY and PITTMAN, JJ., concur.
MURDOCK, J., concurs in part and dissents in part, with writing.
[1] Anderson's wife, Dawn R. Anderson, was also named as a defendant to the action; she was subsequently dismissed as a party. The action proceeded against Amberson and Amberson Construction.
[2] Dawn stated in her affidavit that in August 2002 Anderson initiated a divorce action against her.